**Dr. Yuliya DOBRYDNEVA and Dr. Boris Dobrydnev, Parents of Ilya Dobrydnev, a Minor, Petitioners,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 04–1593V.

United States Court of Federal Claims.

Filed July 30, 2010.

Reissued Aug. 17, 2010.

Mark P. Frielander, Jr., McLean, Virginia, and Mark Greenspan, Norfolk, Virginia, Counsel for Petitioners.

Heather L. Pearlman, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Respondent.

## MEMORANDUM OPINION AND ORDER

SUSAN G. BRADEN, Judge.

On March 12, 2010, a Special Master of the United States Court of Federal Claims ("SM") issued an Entitlement Decision under the National Childhood Vaccine Act of 1986, 42 U.S.C. §§ 300aa–10, *et seq.* (2000) ("the Vaccine Act"), denying Petitioners' claim. *See Dobrydneva ex rel. Dobrydnev v. Sec'y of Health and Human Servs.*, 2010 WL 529422 (Fed.Cl. Mar.12, 2010) ("*Dobrydneva*"). For the reasons discussed herein, the court remands this case to the Special Master for further proceedings. *See* Rule 27(c) of Appendix B: Vaccine Rules of the United States Court of Federal Claims.

## I. RELEVANT FACTS.[1]

### A. Petitioner's Medical Records Prior To The November 5, 2001 Vaccination.

Ilya Dobrydnev was born on April 14, 1991 in Moscow, Russia, and came to the United States when he was 15 months old. TR at 30. During 1992 and 1993, Ilya received three doses of the hepatitis B vaccine.[2] Pet.

---

1. The relevant facts herein were derived from: Petitioners' Appendix of Exhibits ("Pet.Ex.1–23"); the April 25–26, 2007 hearing ("TR 1–740"); Petitioners' Second Filing of Exhibits ("Pet.Ex.1(a)–19(a)"); and Respondent ("Government")'s Appendix of Exhibits ("Gov't Ex. A–CC").

2. The records present inconsistent information, as shown in the following chart:

Ex. 9(a) at 37. Ilya had no adverse reaction to any of these inoculations. Pet. Ex. 19 at 8.

In July 1996, Ilya's mother reported in a kindergarten registration form that Ilya had "frequent colds," a "frequent sore throat," and "frequent ear infection[s]." Pet. Ex. 7 at 12–13.[3] From October 1996 to October 2000, Ilya saw his pediatrician, Dr. Robert Fink, thirteen times for different complaints, including fever, sore throat, and weakness. Pet. Ex. 5 at 44–48; *see also* TR at 143–45.

In 2001, Ilya saw a pediatrician at Pediatric Specialists in Norfolk, Virginia, eight times for upper respiratory system issues. Pet. Ex. 5 at 40–44. On February 26, 2001, a physician associated with Pediatric Specialists observed and noted that Ilya was in the "convalescent phase" of a "recent [Epstein–Barr virus ('EBV')] infection."[4] Pet. Ex. 5 at 39. In January and February 2001, Ilya missed more than twenty days of school. Pet. Ex. 7 at 6. During the same period, a report by Dr. Randall Fisher, a pediatric infectious disease specialist at Children's Hospital of the King's Daughter ("Children's Hospital") in Norfolk, Virginia, indicated that Ilya experienced fatigue. Pet. Ex. 6 at 366; *see also* TR at 73.

In March 2001, Ilya was examined by Dr. Thomas Rubio of the Pediatric Infectious Disease Clinic of the Children's Hospital.

Pet. Ex. 6 at 359. Ilya's mother informed Dr. Rubio that Ilya was very weak and could not walk. *Id.* at 358. When Ilya's mother was advised of the need to perform medical procedures, however, Ilya appeared to have "'recovered' all his strength" and "was able to walk normally, jump, and had normal strength in his lower extremities." *Id.* Nevertheless, Dr. Rubio noted: "I believe that this child is still suffering from some sort of psychological maladjustment perhaps with some fatigue. However, he appear[s] to be safe from suffering from a definite neurological syndrome." *Id.*

In April 2001, Ilya returned to school. Pet. Ex. 7 at 6. On April 23, 2001, Ilya saw Dr. Fink for a sore throat, fever, and fatigue. Pet. Ex. 5 at 38. Dr. Fink diagnosed Ilya as having a probable viral illness, but not mononucleosis. TR at 182. Dr. Fink concluded that Ilya was cured of mononucleosis by April or May 2001.[5] TR at 149; *see also id.* at 259.

On May 25, 2001, Ilya's mother called Dr. Fink to report that Ilya was suffering from a fever, headache, white patches on his throat, and hallucinations. Pet. Ex. 5 at 38. Dr. Fink recommended that Ilya be admitted to a hospital. Pet. Ex. 5 at 38. Ilya's mother decided not to take him to the hospital, but treated him with "leftover" Cefzil™[6] from

| Hepatitis B Vaccination Records for Ilya Dobrydnev | | | |
|---|---|---|---|
| Source | Dr. Robert Fink | School Records & Dr. Robert Lehman | Virginia Health Department |
| Citation | Ex. 7 at 17 (dated Jan. 7, 1997) | Ex. 7 at 15; Ex. 9(a) at 37. | Ex. 9 at 3. |
| **First Dose** | 9/25/92 | 9/25/92 | 11/6/92 |
| **Second Dose** | 11/6/92 | 11/6/92 | 8/6/93 |
| **Third Dose** | 8/6/92 * [sic] *Should be 8/6/93. | 8/6/93 | — |

Dr. Lehman's records appear to be the most thorough and accurate. *See* Pet. Ex. 9(a) at 37 (Dr. Lehman's records including vaccination lot numbers).

3. At the evidentiary hearing, Ilya's mother did not recall filling out this form. TR at 64.

4. The Epstein–Barr virus ("EBV") is a "herpes virus that is the causative agent of infectious mononucleosis." STEDMAN'S MEDICAL DICTIONARY 275 (2007) ("STEDMAN'S"); *see also* TR at 561–62.

5. The Government's experts, Dr. Weitnzen and Dr. Brenner, opined in their expert reports that Petitioner continued to show signs of Epstein–

Barr infection four months later. Gov't Ex. A at 2 (Dr. Weitnzen's opinion); Gov't Ex. D at 1–2 (Dr. Brenner's opinion).

6. Cefzil™ is "a trademark for a preparation of cefprozil." Cefprozil is a "semisynthetic, broad-spectrum, second-generation cephalosporin effective against a wide range of gramnegative and gram-positive organisms, used in the treatment of otitis media and infections of the respiratory and oropharyngeal tracts, skin, and soft tis-

one to two months earlier. Pet. Ex. 5 at 38. On May 30, 2001, Dr. Fink examined Ilya, but warned Ms. Dobrydneva that he had "difficulty making a diagnosis with her self-medicating[.]" Pet. Ex. 5 at 38.

On June 6, 2001, Ilya was seen for a three-day low grade fever and fatigue. Pet. Ex. 5 at 37. On June 7, 2001, Ilya had blood tests performed. Pet. Ex. 6 at 351. Titers [7] for EBV were 37 arbitrary units ("AU"). *Id.* The "EBV Interpretation Chart" indicates that any value exceeding 20 AU is positive for acute infection. *Id.* Dr. Fink observed that this could have been persistent EBV, but this diagnosis was not confirmed. Pet. Ex. 5 at 37; TR at 717. The test also could have simply reflected a recurrence of EBV. Pet. Ex. 5 at 37.

On July 2, 2001, Dr. Fink was informed that Ilya was "fatigued again. At times he has [had] to be carried around." Pet. Ex. 5 at 37. Dr. Fink did not observe fatigue, but referred Ilya to Dr. Cynthia Kelly, an allergist/immunologist at Children's Hospital for further testing. TR at 184–85.

On July 23, 2001, Ilya saw Dr. Kelly. Pet. Ex. 6 at 341. Dr. Kelly reported that Ilya's mother told her that "Ilya has been sick with infectious mononucleosis since December." *Id.* As a result, Dr. Kelly recommended that blood tests be taken. *Id.* at 342. Ilya's mother objected. *Id.; see also* TR at 186–87.

During the summer of 2001, Ilya attended a summer camp for academically gifted children where he played tennis and swam. TR at 40–41.

In the fall of 2001, Ilya started the fifth grade. TR at 43. From October 1 to October 4, 2001, Ilya was absent from school. Pet. Ex. 7 at 5.

## B. Petitioner's Medical Records Following The November 5, 2001 Vaccination.

On November 5, 2001, Ilya received a fourth dose of the hepatitis B vaccine. Pet. Ex. 9 at 3. Thereafter, according to Ilya's mother, he experienced malaise, fever, sore throat, lymph node swelling, and marked pallor. TR at 47; Pet. Ex. 3 at 1–2. Ilya missed school on November 6 and 7, 2001. Pet. Ex. 7 at 5; TR at 47.

On November 19, 2001, Ilya saw Dr. Fink for a "2–3 day history of low grade temperature elevation along with a sore throat," and "some degree of nasal congestion with minimal cough." Pet. Ex. 5 at 36. Dr. Fink diagnosed Ilya as having "febrile illness/viral pharyngitis." *Id.*

By November 26, 2001, Ilya had a yellow nasal discharge and a frontal headache. *Id.* Dr. Fink's diagnosis was sinusitis and Augmentin™[8] 500 was prescribed for 10 days. *Id.; see also* TR at 189–90.[9]

On November 29, 2001, Ilya was diagnosed with a sore throat. Pet. Ex. 5 at 35.

On November 30, 2001, Ilya experienced severe dizziness and nausea. Pet. Ex. 10 at 1. Ilya arrived at Children's Hospital via ambulance, where he was diagnosed with vestibular neuronitis.[10] Pet. Ex. 11 at 2. One of the physicians noted that "the most likely cause of injury is herpes virus." *Id.* Ilya was given prescriptions for Scopolamine [11] and Acyclovir,[12] and was discharged the same day. TR at 49–51.

sues[.]" DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 317 (31st ed. 2007) ("DORLAND'S").

7. A "titer" is "the quantity of a substance required to produce a reaction with a given volume of another substance[.]" DORLAND'S at 1958.

8. Augmentin is a trademark for a "combination preparations of amoxicillin and clavulanate potassium." DORLAND'S at 181.

9. Dr. Fink also noted that Ilya's mother was using an "immunomodulator/stimulant that is made in France." Pet. Ex. 5 at 36.

10. Vestibular neuronitis "causes a self-limited episode of vertigo, presumably due to inflammation of the vestibular division of the 8th cranial nerve; some vestibular dysfunction may persist." THE MERCK MANUAL 795 (18th ed. 2006) ("Merck Manual").

11. Scopolamine is an "anticholinergic alkaloid, derived from several solanaceous plants, including *Atropa belladonna, Hyscyamus niger, Datura* species, and *Scoplia* species ... has effects on the autoimmune system similar to those of atropine." DORLAND'S at 1707. It is used as an antiemetic, particularly in motion sickness. *Id.*

12. Acyclovir is a "synthetic acyclic purine nucleoside analog ... used ... in the treatment of infections." STEADMAN'S at 15. Epstein–Barr virus is a "herpes virus." *Id.* at 275.

On December 3, 2001, Ilya saw Dr. Fink who noted that Ilya should continue using Meclizine,[13] Acyclovir, and a Transderm Scopolamine patch. Pet. Ex. 5 at 35–36. On December 6, 2001, Ilya again visited the doctor with a sore throat. Pet. Ex. 5 at 35. On December 10, 2001, Ilya saw Dr. Fink for a sore throat and "white patches" on his throat. *Id.* Ilya's mother told Dr. Fink that she had been giving Ilya Cefzil, that Dr. Fink had not prescribed. *Id.* Dr. Fink believed that Ilya had tonsillitis. *Id.* On December 26, 2001, Ilya's mother called Dr. Fink to report that Ilya had puss on his tonsils. Pet. Ex. 5 at 55. On December 27, 2001, blood was drawn. Pet. Ex. 6 at 326. Tests indicated that the IgM[14] titers for EBV were elevated (22 AU). Pet. Ex. 6 at 326.

On January 2, 2002, Ilya saw Dr. Jennifer Holland, Dr. Fink's partner. Pet. Ex. 5 at 34. Dr. Holland recorded that Ilya had "no real fevers." *Id.* Dr. Holland noted that Ilya had some blood work done on December 27, 2001, but Ilya's mother was concerned that Ilya still was tired. *Id.* On this date, Ilya's mother first mentioned Ilya began to get sick "two weeks after" his November 5, 2001 hepatitis B vaccination and asked whether that could be the cause of Ilya's health problems. *Id.* On January 9, 2002, Ilya again saw Dr. Holland, who recorded that, although Ilya's mother reported that since January 2, 2002, Ilya's condition worsened, he was "better today." Pet. Ex. 5 at 32–33. On January 14, 2002, Ilya saw a pediatrician at Dr. Fink's practice. Pet. Ex. 5 at 32. This doctor reported that Ilya had "not been able to lie down completely at all because he gets dizzy." *Id.* The doctor made the following note: "recent [EBV] with possible recurrence versus exacerbation," was referred to Dr. Cynthia Kelly and Dr. Doug Mitchell. *Id.* On January 17, 2002, Ilya was tested for EBV

using a polymerase[15] chain reaction ("PCR"). Pet. Ex. 6 at 310. This test did not detect the presence of the EBV. *Id.* On January 23, 2002, Ilya saw Dr. Kelly. Pet. Ex. 6 at 276–77. Dr. Kelly recorded that Ilya's mother again stated that she believed that the hepatitis B vaccine was the cause of Ilya's problems, but Dr. Kelly noted that "Ilya does look allergic to me." *Id.* at 276. Ilya's mother also did not want a prick skin test. *Id.* Dr. Kelly proposed examining Ilya's B-cell function.[16] *Id.*

On February 11, 2002, Ilya saw Dr. Douglas Mitchell, an infectious disease specialist. *Id.* at 282. Dr. Mitchell recommended that Ilya's mother stop administering Acyclovir. *Id.* at 285.[17]

On February 19, 2002, Ilya again saw Dr. Kelly, who noted that "many of [Ilya's] vestibular complaints have improve[d] [but] … He still fatigues easily and has been maintained on homebound [schooling]." *Id.* at 278. Dr. Kelly also noted that Ilya's mother "attribute[d] the improvement in [Ilya's] symptoms to a dose of Acyclovir at 400 mg q.i.d.," but Ilya also was taking Augmentin™. *Id.* Based on laboratory tests, Dr. Kelly determined that Ilya's B-cells functioned reasonably well. *Id.* Dr. Kelly wanted, however, to see whether Ilya's T-cell system functioned normally and whether Ilya had any allergies. *Id.* Ilya's mother objected. *Id.*

On March 20, 2002, Ilya saw Dr. Mitchell for a follow-up appointment. *Id.* at 250. Dr. Mitchell reported that "the majority of [Ilya's] symptoms are achy legs. He is very fatigued and tired." *Id.* Dr. Mitchell also was concerned about whether "there is a behavioral psychological component contributing to this continued subjective fatigue and possibly school avoidance." *Id.* Nevertheless, he noted: "Chronic fatigue syndrome itself may be considered in this child." *Id.*

---

13. Meclizine [hydrochloride] is "an antihistamine used in the management of nausea, vomiting, and dizziness associated with motion sickness and of vertigo associated with disease affecting the vestibular system[.]" DORLAND'S at 1134.

14. IgM is one of five classes of immunoglobulin that are "structurally related glycoproteins that function as antibodies[.]" DORLAND'S at 933.

15. A "polymerase" is "any enzyme that catalyzes polymerization, especially of nucleotides to polynucleotides." DORLAND'S at 1512.

16. B-cells are a component of the immune system. Merck Manual at 1322–24.

17. At some point, Ilya's mother did stop giving Ilya Acyclovir for a period, but then restarted the medication. TR at 203.

Dr. Mitchell recommended Ilya's care be coordinated with Dr. Fink.[18] *Id.*

On April 1, 2002, Ilya saw Dr. Fink. Pet. Ex. 5 at 27. Dr. Fink's assessment included "[p]ossible chronic fatigue secondary to chronic EBV or HSV, though doubt." [19] *Id.* In May 2002, Ilya's doctors continued to record that he was fatigued and weak. Pet. Ex. 5 at 17–18, 20, 25–26; *see also* Pet. Ex. 6 at 112–13. Some doctors suggested that Ilya's problems were psychological.[20] Pet. Ex. 5 at 25–26; *see also* Pet. Ex. 6 at 69–70, 112–13.

On April 25–26, 2007, the dates of the evidentiary hearing, Ilya was not taking any medications, but his mother testified that "[h]e doesn't walk far or he doesn't walk a lot . . . He is homebound and is schooled through the Norfolk Public Schools that provides [a] homebound teacher that instructs him[.].. However, in the past several months, he was able to return to school part time for one class, two, maximum three times a week . . . I do not know whether this improvement is going to last." TR at 60–61; *see also id.* at 99.

## C. Expert Reports.

### 1. Petitioners' Experts.

#### a. October 25, 2004 Report Of David S. Bell, M.D.-Petitioners' Expert.

Dr. Bell is a board-certified pediatrician. TR at 232. He has been an Advisor to the National Institute of Health, and the Chronic Fatigue Syndrome Project of the Center for Disease Control, and is currently part of a Center for Disease Control Program to increase awareness of Chronic Fatigue Syndrome. *Id.* at 232–33. From 2003 to 2006, Dr. Bell was the Chairman of the Chronic Fatigue Advisory Committee to the Department of Health and Human Services. *Id.* at

233. Dr. Bell received an A.B. from Harvard University and is a graduate of Boston University School of Medicine. *Id.* at 231–32. He has published over 35 papers in the field of Chronic Fatigue Syndrome on the prognosis of the illness and its diagnostic issues involving children. *Id.* at 234.

Dr. Bell conducted an examination of Ilya and his family; a physical examination of Ilya; a review of Ilya's medical records; and a review of medical literature on Chronic Fatigue Syndrome. Pet. Ex. 17 at 6–10.

In Dr. Bell's opinion:

[T]he hepatitis B vaccine initiated an immune response in Ilya. This response then caused CFS by either initiating an encephalitis either through an autoimmune response or sustained cytokine activity. I feel that the temporal [sic] relationship between the administration of the vaccine as well as what is known about antigenic stimuli causing CFS creates a definitive link between the vaccine administration and the illness.

Pet. Ex. 17 at 4.

#### b. February 23, 2006 Report Of James Oleske, M.D.-Petitioners' Expert.

Dr. Oleske is a board-certified pediatrician. TR at 456. He is also board-certified in allergy immunology, pediatric infectious disease, and has had two diagnostic laboratory immunology boards. *Id.* He currently supervises an immunology laboratory. *Id.* Dr. Oleske has written over 200 peer-reviewed publications in the field of allergy, immunology, and infectious disease. *Id.* at 457. He actively researches Chronic Fatigue Syndrome in children and adolescents. *Id.* He has treated over 1,000 patients with chronic fatigue-like syndromes. *Id.* For five years, Dr. Oleske has been actively participating in a

---

18. During February and March of 2002, Ilya also saw Dr. Fink several times. Pet. Ex. 5 at 27–30. These visits provide relatively few details other than what was presented by Dr. Kelly and Dr. Mitchell. Pet. Ex. 6 at 278.

19. It is not clear from the text of Dr. Fink's note whether his doubts were about the presence of Chronic Fatigue Syndrome or chronic EBV or HSV, or both.

20. On June 10, 2003, Dr. Randall Fisher, a specialist in pediatric infectious diseases, observed that Ilya's mother's behavior "borders on Munchausen's syndrome by proxy or factitious disorder by proxy." Pet. Ex. 6 at 43 (Child Protective Services ("CPS") investigated and found any concern about child abuse to be "unfounded—lack of evidence." CPS Investigation Report, issued September 30, 2003, at 16).

Center for Disease Control study group, responsible for establishing criteria to standardize diagnostic criteria for adverse reactions to immunizations. *Id.* In addition, Dr. Oleske was elected the Chair of the Chronic Fatigue Syndrome Advisory Committee to the Department of Health and Human Services. For the past 15 years, Dr. Oleske has been the Francis Xavier Bagnoud endowed Chair, Professor of Pediatrics at the University of Medicine and Dentistry of New Jersey. *Id.* at 463. He is also the University's Director of the Center for Children within the Department of Pediatrics of Allergy, Immunology, and Infectious Diseases. *Id.* Dr. Oleske received a Masters in Public Health from Columbia University and is a graduate of the New Jersey Medical School. *Id.* at 455. He completed his fellowship in immunology and infectious diseases at Emory University. *Id.*

Dr. Oleske conducted a review of the EBV laboratory studies of Ilya's case, Ilya's medical records, expert testimony, and the clinical course. TR at 465; Pet. Ex. 23 at 1.

In Dr. Oleske's opinion:

> Based on a review of all the EBV laboratory studies of Ilya's case with medical certitude I can state that EBV was not the basis as initiating cause of Ilya's chronic fatigue syndrome but rather as a direct and proximal cause from *excessive Hepatitis B immunizations.*

> \* \* \*

> The onset of [Ilya's] clinical EBV occurred proximal to his immunization with Hepatitis B and post immunization he had marked elevation in HBV serological titers. Evaluation of [Ilya's] immune system post HBV immunization demonstrated abnormal immune responses that would be characterized as common variable immune deficiency (CVID). Therefore it is more than plausible that Ilya's development of CFS post Hepatitis B vaccination, with the subsequent initiation of an immune response is evidence supporting that he has Chronic Fatigue and CVID syndrome both related to HBV but not related to his more distant post inactive infection with EBV.

Pet. Ex. 23 at 1–2 (emphasis added).

**c. August 22, 2007 Report Of Charles Parker, D.O.-Petitioners' Expert.**

Dr. Parker is a board-certified adult and forensic psychiatrist. Dr. Parker's "Diagnosis and Review of Records" at 3, filed Aug. 22, 2007. He is the Medical Director for CorePsych, a psychiatric consulting firm. *Id.* at 4. Prior to this position, Dr. Parker was the Chief Psychiatrist at Amen Clinics from 2003 to 2007. *Id.* In addition, he is a visiting professor in the Department of Psychiatry at Naval Medical Center Portsmouth. *Id.* Dr. Parker received a B.S. from Westminster College and an M.D. from the Philadelphia College of Osteopathic Medicine. *Id.* at 3.

Dr. Parker reviewed a May 26, 2004 Child Protective Services investigation report; social history from Special Education Norfolk Schools; Confidential Note School Psychiatrist; Psycho-educational Evaluation from Larchmont Elementary; and two clinical reviews. *Id.* at 1.

In Dr. Parker's opinion:

> This case should have never been referred to Child Protective Services. There are no criteria suggesting an arcane, conspiratorial, Munchausen Syndrome downstream from a manipulative, over-controlling mother.

> \* \* \*

> Chronic fatigue syndrome is the primary diagnosis, and in my opinion, with a reasonable degree of medical certainty, is not a result of anything these parents, his mother, his father, or his grandmother could possibly have done to him or with him.

*Id.* at 2.

**2. The Government's Experts.**

**a. February 28, 2005 Report Of Raoul L. Wientzen, Jr., M.D.-Respondent's Expert.**

Dr. Wientzen is a board-certified pediatrician and pediatric infectious disease specialist. TR at 632. Since 1977, Dr. Wientzen has seen nearly 300 patients with chronic

fatigue concerns. *Id.* at 634. From 1977 to 2002, Dr. Wientzen was on the faculty of the Department of Pediatrics at Georgetown University Medical School. *Id.* at 632. In 2002, he left his full-time position with Georgetown. *Id.* Thereafter, Dr. Wientzen became the Medical Director for the Vishnevskaya–Rostropovich Foundation, where he managed and assessed the various health programs for children in Russia and the newly independent states. *Id.* Dr. Wientzen received a B.S. in biology from Georgetown College and M.D. from Georgetown Medical School. *Id.* at 631. In addition, he completed his residency in pediatrics and a fellowship in pediatric infectious disease at Dallas Texas Southwest Medical School. *Id.* at 632.

Dr. Wientzen reviewed Ilya's medical and school records, the petition, affidavits, the expert reports of Dr. Bell and Dr. Kilimas, and literature submitted by Petitioners. Gov't Ex. A at 1.

Dr. Wientzen concluded that Ilya's alleged Chronic Fatigue Syndrome could not be properly diagnosed without a family psychiatric evaluation. Gov't Ex. A at 1–5; TR at 647.

### b. July 27, 2006 Report Of Alan I. Brenner, M.D.-Respondent's Expert.

Dr. Brenner is board-certified in internal medicine and rheumatology. TR at 555. Since 1974, Dr. Brenner has seen thousands of patients with Chronic Fatigue Syndrome. *Id.* at 557. He is a founding fellow of the American College of Rheumatology, a member of the American College of Physicians, and a member of the New York Academy of Sciences. *Id.* at 556. Since June of 2004, Dr. Brenner has been employed by the Southboro Medical Group, a multi-specialty medical group, where he is the Chief Rheumatologist. *Id.* at 555. Dr. Brenner received an A.B. from Brown University and M.D. from University of Cincinnati College of Medicine. *Id.* Dr. Brenner also completed an internship in Internal Medicine at the Department of Medicine Providence Hospital, completed his residency at Tufts–New England Medical Center, and was a Rheumatology Fellow at Boston University Medical

School. *Id.* In addition, since 2002, Dr. Brenner has published five articles analyzing adverse events following vaccination. *Id.* at 557–58.

Dr. Brenner reviewed Ilya's medical records and over 20 articles discussing Chronic Fatigue Syndrome. Gov't Ex. D at 10. In Dr. Brenner's opinion:

> To a reasonable medical certainty, based on my 30 years' experience as a board certified rheumatologist and clinical immunologist, my review of Illya Dobrydneva's medical record and the pertinent medical literature, there is no association, either causal or even temporal, between Illya Dobrydneva's vaccination with hepatitis B (recombinant) vaccine on 11/5/2001 and the subsequent development of either vestibular neuronitis, a peripheral usually viral and not central neurological disorder or the constellation of complaints as reflected in the medical records of Dr. Frederic Fink and termed chronic fatigue syndrome.

Gov't Ex. D at 10.

## II. PROCEDURAL HISTORY.

On October 25, 2004, Ilya's parents filed a petition on his behalf, in the United States Court of Federal Claims, pursuant to the Vaccine Act, alleging that Ilya developed Chronic Fatigue Syndrome as a result of a fourth hepatitis B vaccination. In addition, Petitioners' filed Ilya's medical records (Pet. Exs.5–6, 9–14) and the October 25, 2004 Expert Report of Dr. David Bell. Pet. Ex. 17. This matter was assigned to then Special Master Edwards.

On February 9, 2005, Petitioner filed the Expert Report of Dr. Nancy Kilimas.[21]

On March 3, 2005, the Government filed the Expert Report of Dr. Raoul Wientzen, Jr. Gov't Ex. A.

On February 23, 2006, Petitioners also filed the February 23, 2006 Expert Report of Dr. James Oleske. Pet. Ex. 23. On April 28, 2006, the Government filed a Supplemental Report of Dr. Wientzen in response to Dr. Oleske's Report, in which Dr. Wientzen

---

[21]. Dr. Kilimas subsequently withdrew from the case. *See* Order, filed November 23, 2005.

states that "[n]othing on behalf of the petitioner changes or reforms any of my medical opinions as originally expressed in my own report." Gov't Ex. C. On July 28, 2006, the Government filed Dr. Alan Brenner's Expert Report. Gov't Ex. D.

On April 25 and April 26, 2007, an evidentiary hearing was conducted. After testifying, one of Petitioners' witnesses, Dr. Oleske, left the courtroom and consequently did not hear Dr. Wientzen assert that Ilya's mother's use of Acyclovir depressed the amount of EBV in his body. *See Dobrydneva*, at *15. On June 25, 2007, Petitioners filed supplemental exhibits.

On August 22, 2007, Petitioners filed the Expert Report of Dr. Charles Parker, but did not assign the report an exhibit number. On October 1, 2007, Petitioners filed a letter from Dr. Oleske asserting that EBV was not the cause of Ilya's Chronic Fatigue Syndrome. Pet. Ex. 23.

In February 2008, a telephone hearing was scheduled for June 17, 2008.

On May 2, 2008, Petitioners requested an interim award of costs, plus $22,000 in expenses for the services of Dr. Oleske ("5/2/08 Pet.App."). Petitioner informed the Special Master that Dr. Oleske "will not participate further as a witness without payment of his outstanding bills." *Id.* at ¶ 5. On May 20, 2008, the Government filed an Opposition to Petitioners' request.

On June 9, 2008, Petitioners requested that the June 17, 2008 hearing be postponed until the motion for interim award of costs was resolved. On June 17, 2008, the hearing was postponed.

On August 1, 2008, Special Master Edwards resigned and this case was re-assigned to Special Master Christian J. Moran. On December 11, 2008, Special Master Moran requested that the parties address whether a supplemental hearing was necessary. On January 9, 2009, the Government advised that a supplemental hearing was not necessary. On January 30, 2009, Petitioners agreed that "there is adequate evidence in the record to permit the [successor] Special Master to resolve the issues ... **provided** Petitioners are allowed to offer rebuttal to

address" Dr. Wientzen's opinion. Pet. Resp., filed Jan. 30, 2009, at 1 (bold in original). Petitioners, however, failed to directly address "whether [E]xhibit 23 [Dr. Oleske's Supplemental Report] eliminate[d] the need for a hearing to present rebuttal testimony." *Order*, filed Dec. 11, 2008, at ¶ 2.b.

On April 7, 2009, Special Master Moran determined that Exhibit 23 adequately presented Petitioners' position regarding the EBV and a supplemental hearing was not necessary. He also declined to rule on Petitioners' application for interim fees for Dr. Oleske, and delegated this dispute to the parties to resolve. *Ruling*, 2009 WL 1137915 (Apr. 7, 2009).

On May 14, 2009, Petitioners filed a final brief. On June 10, 2009, Petitioners filed a Renewed Request For Further Consideration Of Petitioners' Application For Interim Medical Expert Fees, since the parties failed to reach an agreement. On June 23, 2009, the Government filed a final brief.

On March 12, 2010, Special Master Moran issued an Entitlement Decision, determining that Petitioners failed to establish "a showing of a proximate temporal relationship between vaccination and injury." *See Dobrydneva*, at *18. On April 12, 2010, Petitioners filed a timely Motion for Review ("Pet.Mot."). On May 18, 2010, the Government filed a Response ("Gov't Resp.").

## III. DISCUSSION.

### A. Standard of Review.

■ Congress authorized the United States Court of Federal Claims with jurisdiction to analyze conclusions of law made by a Special Master under the Vaccine Act *de novo, i.e.,* pursuant to a "not in accordance with law" standard. *See* 42 U.S.C. § 300aa–12(e)(2)(B). "The 'not in accordance with the law' aspect of the standard of review is ... involved ... [where there is] dispute over statutory construction or other legal issues." *Hines v. Sec'y of Health and Human Servs.*, 940 F.2d 1518, 1527 (Fed.Cir.1991).

### B. The Elements and Burden of Proof in Vaccine Act Cases.

The Vaccine Act provides that a petitioner may receive compensation and other relief

under the Vaccine Injury Compensation Program ("Vaccine Program"), if injury can be established either by causation in law or causation in fact. Causation in law is established, if one of the vaccines, listed in the Vaccine Injury Table at 42 U.S.C. § 300aa–14(a) ("Vaccine Table"), was administered to a petitioner and the "first symptom or manifestation of onset or of the significant aggravation of such injuries, disabilities, illnesses, conditions, and deaths" of specific adverse medical conditions, associated with the use of each vaccine occurred within a time period specified in the Vaccine Table. See 42 U.S.C. § 300aa–14(a); 42 C.F.R. § 100.3(a). The Vaccine Table is to be read and interpreted by reference to "Qualifications and aids to interpretation," that define the key terms used therein. Id.

Congress also decided to afford a petitioner the opportunity to receive relief under the Vaccine Program, even if the time period for the first symptom or manifestation of a specified injury is not listed in the Vaccine Table. See 42 U.S.C. § 300aa–11(c)(1)(C)(ii), § 300aa–13. Under these circumstances, a petitioner must establish causation in fact, i.e., first, by establishing a prima facie case offering evidence of sufficient facts to establish each element of the claim and then by meeting a burden of proof as to each element of the claim by a "preponderance of the evidence" standard. See 42 U.S.C §§ 300aa–13. Accordingly, a non-Vaccine Table petitioner must proffer at least some evidence as to each element of the claim and sufficient evidence to persuade the special master or court by a preponderance of evidence. Id.

In interpreting the Vaccine Act, the United States Court of Appeals for the Federal Circuit has held that a petitioner alleging a non-Table vaccine injury must proffer evidence that establishes causation in fact, by a "preponderance of evidence:"

[A] proximate temporal association alone does not suffice to show a causal link between the vaccination and the injury. To prove causation in fact, a petitioner must proffer a medical theory causally connecting the vaccination and the injury. Causation in fact requires proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury. A reputable medical or scientific explanation must support this logical sequence of cause and effect.

Grant v. Sec'y of Health & Human Servs., 956 F.2d 1144, 1148 (Fed.Cir.1992) (citations omitted) (emphasis added); see also Bunting v. Sec'y of Health and Human Servs., 931 F.2d 867, 873 (Fed.Cir.1991) ("[P]etitioner's burden is not to show a generalized' cause and effect relationship' with listed illnesses, but only to show causation in the particular case[.] [Otherwise,] a different and greater burden [would be placed] on petitioners than was enacted by Congress.").

■ In Capizzano v. Sec'y of Health & Human Servs., 440 F.3d 1317 (Fed.Cir.2006), the United States Court of Appeals for the Federal Circuit re-affirmed the three-part test for determining causation in fact in non-Vaccine Table cases, established in Althen v. Sec'y of Health and Human Servs., 418 F.3d 1274 (Fed.Cir.2005) ("Althen"), requiring that a petitioner must:

show by preponderant evidence that the vaccination brought about [the] injury by providing:

(1) a medical theory causally connecting the vaccination and the injury;

(2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and

(3) a showing of a proximate temporal relationship between vaccination and injury.

Capizzano, 440 F.3d at 1324 (quoting Althen, 418 F.3d at 1278).

■ If a petitioner is able to establish causation in fact, then the burden of proof shifts to the Government to establish that a factor unrelated to the vaccine was the actual cause of the petitioner's injury. See 42 U.S.C. § 300aa–13(a)(1)(B); see also Althen, 418 F.3d at 1278.

**C. Petitioners' April 12, 2010 Motion For Review Of The Special Master's March 12, 2010 Decision Denying Entitlement.**

**1. Petitioners' Argument.**

Petitioners argue that the decision by the Special Master Moran is materially flawed,

because they did not have a fair hearing. Pet. Mot. at 1. After Petitioners were required to prepare and file voluminous documentation and engage the medical expert services of two of the nation's leading authorities on Chronic Fatigue Syndrome (one of whom provided an extensive physical examination of the affected child) for a two-day trial, Special Master Edwards resigned, without ruling, or even making any findings as to the weight to be given to the testimony of live witnesses. *Id.* Special Master Moran, however, made credibility assessments about Ilya's mother, whom he did not observe, that became a principal basis for his opinion denying entitlement. *Id.* at 2.

Petitioners also argue that Special Master Moran did not give proper weight to the opinions of Dr. James Oleske and Dr. David Bell, two of the nation's leading authorities on Chronic Fatigue Syndrome. *Id.*

Finally, Special Master Moran erroneously denied Petitioners' request for payment of interim fees to Dr. Oleske to enable Dr. Oleske to attend a supplemental evidentiary hearing to rebut Government expert witness testimony. *Id.*

### 2. The Government's Response.

The Government responds that the proceedings in this case were fundamentally fair and that Special Master Moran's findings of fact were neither arbitrary nor capricious. Gov't Resp. at 9. There is no question that the substitution of a Special Master prior to issuance of a decision is permissible; indeed, it is specifically authorized by the Vaccine Rules. *Id.* at 10–11. In fact, shortly after being assigned to the case, Special Master Moran offered Petitioners the opportunity to have a new hearing. *Id.* at 11. Petitioners declined. *Id.* Thereafter, Special Master Moran consulted with the parties, reviewed the record, read briefs, and determined that a supplemental hearing was not necessary. *Id.* In any event, Petitioners do not state how a supplemental hearing would have affected the outcome of this case. *Id.*

Special Master Moran's determination regarding Ilya's mother's credibility was well supported by the record and not arbitrary nor capricious. *Id.* at 12–13. Likewise, Special Master Moran's conclusion that Petitioners did not establish a medically appropriate temporal relationship between Ilya's vaccination and onset of injury was not arbitrary or capricious. *Id.* at 16. Specifically, Petitioners failed to establish when the onset of Ilya's injury occurred. *Id.* Nevertheless, assuming that Petitioners established the onset of injury, they failed to establish by a preponderance of evidence the medically appropriate time interval between the vaccination and injury. *Id.* at 17. Petitioners mischaracterize Special Master Moran's ruling to conclude that Dr. Bell and Dr. Oleske were not credible witnesses where, in fact, he only found their expert reports and testimony insufficient to define the appropriate medical temporal relationship between the vaccine and the onset of Ilya's injury. *Id.* at 18.

Finally, Special Master Moran did not err in failing to grant Petitioners' application for interim expert fees. *Id.* at 19. An interim attorney award "is not a right, but rather lies within the discretion of the special master." *Id.* Furthermore, the decision to not award interim fees was justified, because there was no need to hear further testimony from Dr. Oleske. *Id.*

## IV. THE COURT'S RESOLUTION.

In *de Bazan v. Sec'y of Health and Human Servs.*, 539 F.3d 1347 (Fed.Cir.2008), the United States Court of Appeals for the Federal Circuit held that *Althen* requires "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *Id.* at 1352; *see also Pafford v. Sec'y of Health and Human Servs.*, 451 F.3d 1352, 1358 (Fed.Cir.2006) ("Without *some evidence* of temporal linkage, the vaccination might receive blame for events that occur weeks, months, or years outside of the time in which scientific or epidemiological evidence would expect an onset of harm."). *Id.* at 1358 (emphasis added).

In this case, the Special Master determined that Petitioners failed to establish, by a preponderance of the evidence, "a proximate temporal relationship between vaccina-

tion and injury." *Dobrydneva*, at *18 (quoting *Althen*, 418 F.3d at 1278). The Special Master reached this conclusion, because Petitioners and their experts were not "explicit about when they believe [Chronic Fatigue Syndrome] started." *Id.* at *19 (emphasis added). The third prong of *Althen*, however, does not require a petitioner to "explicitly" identify "when" the injury started, but to show "a *proximate* [22] *temporal* [23] relationship between the vaccination and injury." *Althen*, 418 F.3d at 1278. As *de Bazan* emphasized, this showing depends on the "medical understanding" of the cause of the injury. *See de Bazan*, 539 F.3d at 1352.

Chronic Fatigue Syndrome is a "persistent debilitating fatigue *lasting longer than six months*, with other known medical conditions having been ruled out by clinical diagnosis, accompanied by at least four of the following: significantly impaired short term memory or concentration; *muscle weakness, pain* in multiple joints without swelling or redness, *sore throat, tender lymph nodes, headaches*, unrefreshing sleep, and *malaise*, that lasts more that 24 hours following exertion." DORLAND's at 1851 (emphasis added). Therefore, the "medical understanding" of this condition is that it may take up to six months for at least four of the symptoms to develop and for clinical testing to be done to eliminate other causes.

What the medical record evidences in this case is that, on November 5, 2001, Ilya received an unnecessary and "excessive" fourth dose of the hepatitis B vaccine. Pet. Ex. 9 at 3; Pet. Ex. 23 at 1. Ilya was absent from school on November 6, 7, 19, 20, 21, and 26. Pet. Ex. 7 at 5. On November 19, 2001, Ilya was diagnosed with "some degree of nasal congestion with minimal cough." Pet. Ex. 5 at 36. Within a week, by November 26, 2001, Ilya had developed a yellow nasal discharge and *frontal headaches* diagnosed as sinusitis and Augmentin™ 500 was prescribed for ten days. *Id.* On December 27, 2001, blood tests indicated that Ilya had abnormal immunoglobulin levels, indicating an immune response. Pet. Ex. 6 at 326. On January 2, 2002, Ilya experienced a *sore throat* and *fatigue*. *Id.* at 34 (emphasis added).[24] On January 2, 2002, Ilya's physician's assessment was "*muscle weakness*." Pet. Ex. 11(a) at 113 (emphasis added). On January 23, 2002, Ilya had "difficulty lying supine because of some neck stiffness[.]" Pet. Ex. 6 at 276. On March 18, 2002, "persistent atypical lymphocytes" [25] were noted. Pet. Ex. 5 at 28. On March 20, 2002, one of the examining physicians observed "Chronic [F]atigue [S]yndrome itself may be considered in this child." Pet. Ex. 6 at 250 (emphasis added).

■ Therefore, within three months of Ilya's unnecessary and "excessive" fourth dose of the hepatitis B vaccine, headaches, sore throat, malaise, muscle weakness, and "atypical" lymph cells were observed by Ilya's doctors and documented in medical records, and an initial diagnosis of possible "Chronic Fatigue Syndrome" was suggested—completely independent of Ilya's mother's testimony and other proffered information from her. Therefore, Petitioners produced preponderant evidence that the onset of Chronic Fatigue Syndrome occurred after the November 5, 2001 vaccine and manifested symptoms well within the time period accepted and expected by the medical community. *See de Bazan*, 539 F.3d at 1352; *see also Pafford*, 451 F.3d at 1358.

■ The Special Master also failed to consider that, given the dearth of available etiological data in the vaccine area, in some

---

22. "Proximate" means: "1. immediately before or after, 2. Very near or close in time or space." BLACK'S LAW DICTIONARY (9th ed.2009) at 1346; *see also* DORLAND's at 1562 ("immediate or nearest").

23. "Temporal" means "pertaining to time; limited as to time; temporary." DORLAND's at 1903.

24. On January 2, 2002, Ilya's mother also first asked whether the hepatitis B shot "could be playing a role in this." Since Petitioners' Complaint was not filed until October 25, 2004, it is difficult to discern any litigation-driven motivation for this inquiry, particularly in light of her related medical training—an issue to which the court will return.

25. A "lymphocyte" is a "mononuclear nonphagocytic leukocyte[ ], found in the blood, lymph, and lymphoid tissues, that are the body's immunologicaly competent cells and their precursors." DORLAND's at 1110.

circumstances, a petitioner may not be able to provide a *specific timeframe*. *See de Bazan*, 539 F.3d at 1352 (requiring "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation"); *see also Pafford*, 451 F.3d at 1358 (holding that "*some evidence* of temporal linkage" is required for a petitioner to demonstrate a causal link between the vaccination and injury) (emphasis added). For this reason, an acceptable timeframe, "given the medical understanding of the disorder's etiology," (*de Bazan*, 539 F.3d at 1352) also may be the best evidence available of a "medical theory causally connecting the vaccination and the injury." *Althen*, 418 F.3d at 1278 (citation omitted). *See Capizzano v. Sec'y of Health and Human Servs.*, 440 F.3d 1317 (Fed.Cir.2006) ("We see no reason why evidence used to satisfy one of the *Althen III* prongs cannot overlap to satisfy another prong."). Therefore, the opinions of Dr. Bell [26] and Dr. Oleske [27] may be considered by the Special Master as supplemental evidence to satisfy prong 2, as well as prong 3 of *Althen*.

The court also was struck by the Special Master's near-obsession with discrediting Ilya's mother's contemporary observations, affidavits, and sworn testimony.[28] This was particularly troubling in light of the fact that the Special Master neglected to mention at any point in his lengthy methodical dissection of Ms. Dobrydneva's testimony that, prior to immigrating to the United States in 1992, she obtained a degree from the School of General Nursing in Moscow and a Master's Degree in Microbiology from the Moscow Technological

Institute. TR at 28. In addition, she did clinical work with the Central Institute of Postgraduate Medical Education, was an instructor, research affiliate, and taught clinical immunology to doctors. TR at 28–29. In addition, the Special Master also neglected to mention that Ilya's mother subsequently received a Ph.D. in biomedical science from the Eastern Virginia Medical School in 2000, with specialization in clinical chemistry laboratory. TR at 44. More importantly, by the time Ilya received his fourth hepatitis B vaccine in November 2001, his mother was a post-doctoral fellow, doing research under grants for the American Heart Association, Cancer Research and Prevention Foundation, and the Commonwealth Health Research Board of Virginia. TR at 45. And, at the time of her testimony, she was a member of the faculty of the Eastern Virginia Medical School, Division of Pharmacology, where she taught medical students and conducted research. TR at 44.

■ Apparently, the Special Master considered this information irrelevant. *See Dobrydneva.* The court does not mean to require a Special Master to accord a parent's observations or prognosis, even one with related medical training, with more credibility than that given to contemporaneous medical records, the opinion of independent treating medical professionals, or medical experts, but the fact that a parent has related medical training and raises the potential nexus between a vaccination and subsequent medical injury, is relevant and at least should be disclosed in context. The Special Master's deliberate omission of this relevant information undercuts his credibility determinations, particularly since he did not observe her

---

26. Ex. 17 at 4 (Dr. Bell: "I feel that the temporal [sic] relationship between the administration of the vaccine as well as what is known about antigenic stimuli causing CFS creates a definitive link between the vaccine administration and the illness.").

27. Ex. 23 at 1–2 (Dr. Oleske: "The onset of [Ilya's] clinical EBV occurred proximal to his immunization with Hepatitis B[.]").

28. *See Dobrydneva*, at *5 ("Ms. Dobrydneva was not an accurate historian"); *see also id.* at *9 ("Ms. Dobrydneva's accuracy is questionable in general, her general assumptions are inconsis-

tent with conduct, her testimony is inconsistent, and the only document supporting Ms. Dobrydneva's assertions [that Ilya was not well after the vaccinations] is inaccurate."); *9 ("Overall, Ms. Dobrydneva's recounting of past events has been less than accurate."); *10 ("Ms. Dobrydneva's account ... varied."); *11 ("Ms. Dobrydneva's testimony was not credible[.]"); *12 ("This testimony is not credited."). In addition, it appears the Special Master embarked on his own independent evidentiary investigation, *i.e., "the undersigned has located additional evidence* about Ilya's condition after November 5, 2001." *See Dobrydneva*, at *8 (emphasis added).

testimony in person. *See Bradley v. HHS*, 991 F.2d 1570, 1575 (Fed.Cir.1993) ("The fact-finder has broad discretion in determining credibility *because* he saw the witnesses and read the testimony.") (emphasis added).

 Another aspect of the Special Master's handling of this case requires discussion. In a May 2, 2008 Application for Interim Payment for Dr. James M. Oleske, Petitioners advised the Special Master that: "Based upon conflicting medical opinions . . . it is essential for a complete presentation of Petitioner's case that Dr. Olseke testifies in rebuttal[.]" 5/2/08 Pet.App. at ¶ 2. A rebuttal proceeding was scheduled for June 17, 2008. *Id.* at ¶ 3. Dr. Oleske represented that he would not participate without payment of outstanding bills that Petitioners could not pay. *Id.* at ¶¶ 5–6. As a matter of law, the Special Master has authority to award interim costs. *See Avera v. HHS*, 515 F.3d 1343 (Fed.Cir.2008). Although that decision concerned only interim for fees of counsel, denying expert interim fee awards "would work substantial hardship on plaintiffs . . . and discourage the institution of actions despite the clear congressional intent to the contrary." *Id.* at 1352. In addition, denying interim fee awards would "clearly make it more difficult for claimants to secure competent [experts]." *Id.* Although our appellate court did not directly address the due process implications of denying interim counsel or interim expert witness fees, in light of the *Althen* requirements in non-Vaccine Table cases, they are evident. To prevail in a non-Vaccine Table case, petitioner's must be able to consult and retain medical experts of the caliber of Dr. Oleske, as well as Dr. Bell. Otherwise, the entire remedial system Congress implemented will be illusory. *Id.*[29] Therefore, the court has determined that the Special Master's denial of Petitioners' interim request for Dr. Oleske's fees was prejudicial, an abuse of discretion, and raises significant issues under the Vaccine Act and due process clause.

For these reasons, the Special Master is directed to issue an Order To Compensate Petitioners $22,834.20 in Response To Petitioners' May 2, 2008 Application for Payment, subject to the court's reconsideration. *See* RCFC 60.

Finally, in response to a December 11, 2008 Scheduling Order requesting whether a "complete new trial was required," Petitioners responded, "No . . . **provided** Petitioners are allowed to offer rebuttal to address the Opinion vigorously asserted by the Government's expert witness, Dr. Raoul Wientzen." 1/20/09 Response To [December 11, 2008] Scheduling Order (bold in original). In addition, the Special Master's December 11, 2008 Order asked: "Whether Exhibit 23 [Dr. Oleske's Supplemental Report] eliminates the need for a hearing to present rebuttal testimony." Scheduling Order, *Dobrydneva*, No. 04–1593V (Dec. 11, 2008) at ¶ 2. Although Petitioners did not provide a specific response, it appears to the court that Petitioners' Response to I and II provided information indicating that their response was "no." *See* 1/20/00 Response To [December 11, 2008] Scheduling Order at 1–4.

 The Special Master, however, concluded that whether he should conduct the limited supplemental hearing requested by Petitioners was dependant on two issues: "whether Dr. Wientzen's testimony exceeded the scope of his report, such that [Petitioners] are entitled to rebuttal testimony. The second issue is[,] assuming that Dr. Wientzen testimony introduced new topics, what relief is appropriate." *Ruling*, 2009 WL 1137915 (Apr. 7, 2009), at 6. Whether a supplemental hearing was required, however, was answered in the affirmative by former Special Master Edwards in scheduling one for June 17, 2008. Clearly, former Special Master Edwards thought a further hearing was required. Therefore, Special Master Moran's focus should have been to determine was the scope of that hearing. In the court's judgment, Petitioners' proposed limited scope was entirely appropriate and the Special

---

**29.** In this regard, the court considers the Government's May 20, 2008 Opposition challenging Dr. Oleske's hourly fee and modest preparation time to be insulting to an expert of his professional caliber and contrary to congressional in-

tent. The court, having reviewed the underlying support for Dr. Oleske's well documented fee request finds that, other than $6.00 of expense incurred on 4/23/07, the request was reasonable.

Master's obfuscation of the Petitioners' request was an abuse of discretion.

In light of the Special Master's failure to properly apply the standard of the third prong of *Althen* and his selective review of the relevant facts, this case is remanded for the Special Master to:

1. Issue re-considered findings regarding the third prong of *Althen* consistent with this Memorandum Opinion and Order;

2. Render findings regarding the first and second prong of *Althen;*

3. Authorize the payment of Petitioners' request for the fees of Dr. Oleske, subject to the court's reconsideration;

4. Re-convene supplemental proceedings if requested, particularly since the Special Master admitted: "More clarity by Dr. Bell would have been helpful." *Dobrydneva,* at \*20; *see also id.* at \*22 ("Additional Issues").

## V. CONCLUSION.

For the reasons discussed herein, pursuant to Rule 27(c) and Rule 28(b) of Appendix B: Vaccine Rules of the United States Court of Federal Claims, the court vacates the Special Master's March 12, 2010 decision and remands this matter to the Special Master for 90 days to comply with the instructions expressed herein.[30]

## IT IS SO ORDERED.

---

30. *See* House Report 99–908, 1986 U.S.C.C.A.N. at 6344 ("House Report") (awards are to be "made to vaccine-injured persons quickly, easily and with certainty and generosity").